TRUSTEES OF BAKER UNIVERSITY v. CLELLAND et al.

No. 10583.

Circuit Court of Appeals, Eighth Circuit.

Oct. 14, 1936.

Leslie J. Lyons, of Kansas City, Mo., and Frank G. Drenning, of Topeka, Kan. (Donald E. Lyons, of Kansas City, Mo., on the brief), for appellant.

John F. Rhodes, of Kansas City, Mo. (Justin D. Bowersock and Robert B. Fizzell, both of Kansas City, Mo., on the brief), for appellees.

Before GARDNER and SANBORN, Circuit Judges, and NORDBYE, District Judge.

SANBORN, Circuit Judge.

This is an appeal from a decree canceling a trust deed upon lands owned by appellees and the $20,000 note secured thereby.

The appellee Martha Clelland is the widow of William Clelland, who died in 1890. The appellees Mattie A., William R., and Frank W. Clelland are the children of William and Martha Clelland. James Clelland, who died in December, 1929, was the brother of William Clelland, deceased, and the uncle of Mattie A., William R., and Frank W. Clelland. The home of the Clelland family was at New Hampton, Harrison county, Mo. Both James and William Clelland were owners of farm lands and were engaged as partners in farming and stock raising. The lands of William, upon his death, were inherited by his wife and children. William R. Clelland was, at the time of his father's death, eleven years old. Frank W. Clelland was apparently younger, for he did not graduate from college until 1907. Mattie A. Clelland's age does not appear.

James Clelland, who was a bachelor and lived with his brother's family after his brother's death, continued the business in which he and his brother had been engaged. James naturally became, because of his age, experience, and relationship, the head of the family. Both James and William were evidently men of substance and force and leaders in the community where they lived.

Missouri Wesleyan College, of Cameron, Mo., (hereinafter referred to as the college) was an educational institution. Frank W. Clelland was educated at this college, graduating in 1907. From 1910 to 1919 he taught there in the Department of Bible and Philosophy, "Chair of English Bible in memory of William Clelland." He then became a teacher in Boston University, and at the time of the trial of this case lived in Boston, Mass. William R. Clelland became a trustee of Missouri Wesleyan College. He apparently followed in his father's footsteps, becoming a farmer and stock raiser in association with his uncle, James Clelland.

In 1908, the college was in debt and had no adequate endowment fund. At a meeting of the Missouri Annual Conference of the Methodist Episcopal Church at Tarkio, Mo., a Mr. Rankin, of Onarga, Ill., offered to give $25,000 to the college if its friends would pay its debts and would raise an endowment fund which would equal $143,000, including Mr. Rankin's gift. The Rankin offer was limited as to time. Dr. Agnew was president of the college at the time the campaign to meet the terms of the Rankin offer started, but a break in his health caused the campaign to lag, and Dr. De Bra took over the presidency in July, 1909. When Dr. De Bra became president, the time within which the conditions of the Rankin gift must be met would expire the following year. An extension of time was procured from Mr.

Rankin, and the campaign was continued with renewed vigor by Dr. De Bra.

In 1910, William R. Clelland and Frank W. Clelland signed a subscription note in favor of the college for $5,000. Up to that time James Clelland had subscribed nothing. Dr. De Bra first solicited James to give $10,000, but finally wrote to him and said that, after canvassing the whole situation, he (Dr. De Bra) thought that James was the one man who could "stand up" with Rankin and give a like amount. The idea seemed to appeal to James, and in the summer of 1911—the latter part of July or the first of August—he signed a pledge note for $25,000, in order to keep the Rankin offer alive. While this pledge note which James Clelland signed could not be located at the time of the trial, the evidence showed that it was in the following form:

"Missouri Wesleyan College Bond.
"Cameron, [date].

"In consideration that W. A. Rankin of Onarga, Illinois, has promised to give to Missouri Wesleyan College the sum of twenty-five thousand dollars ($25,000.00) endowment, if the friends of the institution will pay all indebtedness and secure one hundred thousand dollars additional endowment. Therefore, I hereby promise to pay to the said Missouri Wesleyan College of Cameron, Mo., the sum of ———— one-half to be paid within thirty (30) days from the time that it shall be officially announced that the above proposition has been met and the other half within one year from that date; deferred payments to bear interest at the rate of five per cent. per annum.

"Address:"

Both Frank W. and William R. Clelland had urged their uncle to subscribe to the endowment fund. In making his pledge, James told Dr. De Bra: "You cannot make it without we help you. You cannot make it without the $25,000." He also told Dr. De Bra that his nephews had "no business to sign that pledge for $5,000; they cannot afford it; this is my gift. * * * You must tear up that pledge; promise me you will tear up that pledge of $5,000, then I will give this." The nephews' pledge was either destroyed or disregarded.

In making his gift to the college, it was also understood between the college and James Clelland that the income from the gift was to be used to establish and maintain a Chair of English Bible in memory of his brother, William Clelland. The college, after James Clelland's subscription was signed, established, and maintained such a Chair, which was held by Frank W. Clelland until 1919, when another teacher was employed. In 1926, a formal declaration of trust was executed by James to insure the income from his gift being so used. This declaration of trust also provided that, in the event Missouri Wesleyan College should be closed, the income from the trust fund of the "William Clelland Chair of English Bible" should be transferred to the college's legal successor if the successor should be a degree-granting college.

By December 31, 1912, the college had completed the campaign for subscriptions to meet the conditions of the Rankin pledge. In January, 1913, the board of trustees of the college met with Mr. Rankin, and arrangements were made for the collection of the subscriptions. Mr. Rankin gave his note for $25,000 to the college, but insisted upon arrangements being made for reducing all subscriptions to cash or to evidences of indebtedness approved by him. He took a bond from the college and the Cameron Trust Company, its fiscal agent, which recited in part that, "On the first day of January, 1913, the friends of said Missouri Wesleyan College had taken in subscription notes the sum of" $203,897, and had on hand old endowment notes in the sum of $8,784.83; that "W. A. Rankin is satisfied that the face of said subscription and Endowment notes is greater than the amount of the said indebtedness and of the Endowment required under his proposition, but that he is desirous of stimulating and encouraging the officers and agents of said College to speedily materialize the full amount of said debts and Endowment"; that, "It is desired that the said W. A. Rankin now give his note for said Twenty-five Thousand and no/100 Dollars ($25,000.-00) with interest to begin thereon from the date that said indebtedness is liquidated, and that he make payments on account thereof in proportion as other subscribers to said Endowment Fund shall pay on account of the same"; and that, "It is further agreed and understood that if the full amount of said debts are not paid, and said Endowment Fund, including said Twenty-five Thousand and no/100 Dollars ($25,-000) to be paid by said Rankin, does not equal the sum of One Hundred and Forty-three Thousand and no/100 Dollars ($143,-

000.00) on or before the Tenth day of June, 1914, which Endowment Fund is to be collected in cash, or by well secured solvent notes, or notes to be approved by said Rankin or his executors or assigns, then the amount of principal and interest paid by said Rankin on his said note of Twenty-five Thousand and no/100 Dollars ($25,-000.00) is to be returned to him at once." The Rankin note was placed with the Cameron Trust Company to be collected or returned to Mr. Rankin in accordance with the agreement.

On June 10, 1914, there had been an insufficient amount collected on subscriptions to meet Mr. Rankin's conditions, and he extended the time to September 1, 1915. The latter date was regarded as the "dead line." On September 1, 1915, there was still a deficiency in the amount collected, and fifty friends of the college were called together at Cameron on that day to discuss what might be done. On the morning of that day, James Clelland, who was in Cameron staying with "Professor Frank," went into conference with Mr. Althouse, the president of the Cameron Trust Company, to decide what was to be done about the payment of his (James Clelland's) subscription. The fifty friends of the college agreed to sign two joint notes covering the unpaid subscriptions, which subscriptions were to be put up as collateral to protect the signers of the notes. During the discussion on this proposal, Mr. Althouse and James Clelland came into the meeting. Althouse, after having the proposed plan explained to him, said, "Well you need not include Mr. James Clelland's pledge in these joint notes, for that has been satisfactorily arranged."

The problem with which James Clelland was faced on September 1, 1915, was this: He had lands, but not cash. He did not wish to sell or encumber his real estate, for there existed at that time a rising land market which he no doubt expected to turn to his advantage. He must produce cash or its equivalent to insure the payment of Mr. Rankin's pledge. The problem was solved in this way: James Clelland, on September 1, 1915, gave to the Cameron Trust Company a thirty-day note for $25,000; and the trust company then made a journal entry of a $25,000 loan to "James Clelland et al." and credited the college with a $25,000 deposit in its endowment fund account. That deposit is evidenced by a deposit slip and also by an entry in

the individual ledger sheet of the trust company, as trustee for the college. The trust company records indicate that the note of September 1, 1915, was executed by James, Frank W., and William R. Clelland as comakers, or executed by James as maker and indorsed by the nephews. The nephews deny that they either executed or indorsed the note. In our view, it is not important whether they did either. They were both men of intelligence and understood what was being done—Frank was a professor in the college; William was one of its trustees.

Having accomplished the actual or apparent payment of his subscription, it now became necessary for James to satisfy his obligation to the trust company which had loaned him the credit. That was done in this way: On September 27, 1915, the appellees, Frank W., William R., Mattie A., and Martha Clelland, at the request of James Clelland, executed their joint note for $20,000 and delivered it to the college, at the same time executing a trust deed covering lands inherited by them from William Clelland, which trust deed they delivered to the trust company as trustee for the college. The college then made a journal entry of a $20,000 loan from its endowment fund to the appellees. On September 29, 1915, James Clelland executed and delivered to the college a note for $5,000, and delivered to the trust company a deed of trust covering lands owned by him. The college then made a similar journal entry of a $5,000 loan from its endowment fund to James Clelland. It should not be understood from these loan entries that any money actually passed from the college to the appellees or to James Clelland. What really occurred was that credit was transferred from the endowment account with the trust company and applied in satisfaction of James Clelland's debt to the trust company. Such transfer of credit is evidenced by two journal entries made by the trust company to the credit of "James Clelland et al."—one of $5,000 on September 29, 1915, and one of $20,000 on October 5, 1915. So, without the exchange of any money whatever, James Clelland, or James and his nephews, borrowed, ostensibly at least, $25,000 from the trust company and paid James' pledge to the college. Then James borrowed $5,000 from the college to apply on his indebtedness to the trust company, and Frank W., William R., Mattie A., and Martha borrowed $20,000, also from

the college, for the same purpose. In this way, Mr. Rankin, who examined and approved the notes and trust deeds given by the Clellands to the college and the trust company, was satisfied and led to pay his subscription.

James Clelland doubtless intended to pay the appellees' $20,000 note himself out of the proceeds or profits from the sale of his lands when he should deem it advantageous to sell them. That was understood between himself and his nephews. Frank W. Clelland testified that the $20,000 note was executed "at the request of Uncle James that we accommodate him until he could get his securities or assets converted into cash to pay his obligation to the college. * * * It was for the purpose of satisfying Mr. Rankin's demand on the one hand and accommodate him until he could meet that." However, the note became due in September, 1925, without having been paid, and was extended for five years with an increase in the interest rate from 5 to 6 per cent., the extension agreement reciting that the college had loaned the appellees $20,000 on September 27, 1915. James Clelland died in 1929 without having paid anything on the note. Interest thereon was paid regularly up to September 29, 1930. William R. Clelland paid the interest due on the latter date. Prior to that time it was paid out of joint funds of James and the appellees.

In 1930, Missouri Wesleyan College, unable to carry on financially, closed its doors, and on April 10, 1931, the $20,000 note and deed of trust executed by the appellees were, by a decree of the circuit court of Clinton county, Mo., transferred to the appellant, the Trustees of the Baker University, a corporation, as substitute trustees, subject to the declaration of trust.

On June 31, 1931, the appellees brought this suit in the circuit court of Harrison county, Mo., to cancel their note and the deed of trust securing it. The case was removed by the defendant (appellant), the Trustees of the Baker University, on the ground of diversity of citizenship, to the United States District Court for the Western District of Missouri. That court held the appellees' note to be without consideration on the ground that it was given to satisfy, in part, James Clelland's subscription, which was unenforceable for lack of consideration. A decree adjudging the note and trust deed null and void and enjoining any sale of the property covered by the trust deed was entered. From that decree this appeal is taken.

No question as to the appellant's title to the note and deed of trust is raised, appellees relying solely upon their assertion that those instruments are invalid, mainly for lack of consideration sufficient to support James Clelland's subscription or to support the $20,000 note of the appellees.

We shall consider first the question of the validity of James Clelland's subscription. The general rule is that a subscription to a charitable or other institution must be supported by a consideration in order to be a binding obligation. Trustees of La Grange College v. Parker, 198 Mo. App. 372, 200 S.W. 663; Allegheny College v. National Chautauqua County Bank, 246 N.Y. 369, 159 N.E. 173, 57 A.L.R. 980; 60 C.J. 955; 25 R.C.L. 1399, 1400. What constitutes a sufficient consideration is, with some exceptions, still a controversial question. Some states have held that the mutual promises of subscribers constitute consideration sufficient to make the subscriptions binding. See Cotner College v. Hyland et al. (1931) 133 Kan. 322, 299 P. 607; Greenville Supply Co. et al. v. Whitehurst et al., 202 N.C. 413, 163 S.E. 446; Board of Home Missions, etc. v. Manley, 129 Cal.App. 541, 19 P.(2d) 21; LaGrange Female College et al. v. Cary, 168 Ga. 291, 147 S.E. 390; Petty v. Trustees of the Church of Christ, etc., 95 Ind. 278; Brokaw v. McElroy, 162 Iowa, 288, 143 N.W. 1087, 50 L.R.A.(N.S.) 835; Waters v. Union Trust Co., 129 Mich. 640, 89 N.W. 687. Other states, including Missouri, have held that the subscription of one subscriber does not constitute consideration for the subscription of another. See Methodist Orphans' Home Association v. Sharp's Executor, 6 Mo.App. 150; McClanahan v. Payne & Campbell, 86 Mo.App. 284; Trustees of LaGrange College v. Parker, 198 Mo.App. 372, 200 S.W. 663; Cottage Street Church v. Kendall, 121 Mass. 528, 23 Am.Rep. 286; Twenty-Third St. Baptist Church v. Cornell et al., 117 N.Y. 601, 23 N.E. 177, 6 L.R.A. 807.

While it may be true, as the appellant contends, that the conditional pledge of Rankin was sufficient consideration to support the pledge of James Clelland, we think it is unnecessary to pass upon that question in this case. It is the rule in Missouri, as well as elsewhere, that there is a sufficient consideration to support such a

subscription as that made by James Clelland whenever expense has been incurred or obligations have been undertaken by the promisee in reliance upon the promise.

In School District v. Sheidley et al., 138 Mo. 672, 40 S.W. 656, 37 L.R.A. 406, 60 Am.St.Rep. 576, a school district sought to recover upon three promissory notes for $5,000 each given by one Sheidley as voluntary subscriptions to enable the district to build a library. Immediately after the notes were executed, the board of education passed a resolution directing the submission to the electors of a proposed bond issue to help finance the building. The matter was submitted and acted upon favorably. The bonds were issued and sold, and the board then sought to collect the notes. The representatives of Sheidley's estate (Sheidley having died prior to the time when the school district sought to recover) defended on the ground that the notes were void for want of consideration. The court held that the submission to the electors of the proposal to borrow funds, the expense of the election, and the issuance of the bonds, constituted sufficient consideration for the notes. In reaching that conclusion, the court said (138 Mo. 672, at page 684, 40 S.W. 656, 658, 37 L.R.A. 406, 60 Am.St.Rep. 576): "The consideration will be sufficient to support the promise if the district expended money and incurred enforceable liabilities in reliance thereon. If the expense was incurred and the liability created in furtherance of the enterprise the donor intended to promote, and in reliance upon the promises, they will be taken to have been incurred and created at his instance and request, and his executors will be estopped to plead want of consideration. The gratuitous promises will thus be converted into valid and enforceable contracts. Brooks v. Owen, 112 Mo. 251, 19 S.W. 723, 20 S.W. 492; Koch v. Lay, 38 Mo. 147; Steele v. Steele, 75 Md. 477, 23 A. 959; University v. Estate of Livingston, 57 Iowa, 307, 10 N.W. 738 [42 Am.Rep. 42]; Simpson College v. Tuttle, 71 Iowa, 596, 33 N.W. 74; Trustees v. Garvey, 53 Ill. 401 [5 Am.Rep. 51]; Amherst Academy v. Cowls, 6 Pick. [Mass.] 427 [17 Am.Dec. 387]; Pitt v. Gentle, 49 Mo. 74; Richelieu Hotel Co. v. International Encampment Co., 140 Ill. 248, 29 N. E. 1044 [33 Am.St.Rep. 234]."

In Koch v. Lay, Garnishee of Webster College, 38 Mo. 147, the plaintiff, who had a judgment against Webster College, summoned the defendant as garnishee. The evidence showed that the defendant, several years prior to the service of the garnishment, executed and delivered to the college five promissory notes which purported to be in payment of scholarships. This was the method taken by the college—which possessed no money prior to organization—to raise an endowment fund. Upon the strength of these notes, along with others, the college purchased land, built a school, employed professors, and for a number of years kept up an institution of learning. Financial embarrassment, caused in part at least by failure of those who had given notes to pay them, brought about the dissolution of the college. It was insisted by the defendant that, since the college could no longer continue the scholarship, he was no longer bound. The Missouri Supreme Court said (38 Mo. 147, at pages 149, 150):

"Had there been no expense incurred—no buildings put up—no professors employed, and no contracts entered into, then there would have been some justice and propriety in the plea of want of consideration. Where notes are given by one or more persons to any corporation, or other legal person, or any trustees, by way of voluntary subscription, to raise a fund to promote an object, these notes are open to the defence of a want of consideration, unless the payee has expended money, or entered into engagements, which, by a legal necessity, must cause loss or injury to the payee if the notes are not paid—1 Pars. on N. & B. 202. There are many cases which hold that gratuitous promises may be enforced, where they have operated to induce engagements and liabilities, within the knowledge of the promisor—Sto.Contr. § 453, and cases cited. Incurring expense, and assuming liabilities in consequence of the promise, is regarded as a sufficient consideration for the promise—Barnes v. Perine, 9 Barb. [N.Y.] 202; Amherst Acad. v. Cowls, 6 Pick. [(Mass.) 427] 433 [17 Am.Dec. 387]. The corporation, in consequence of the promise of defendant and others, who had given their notes in the same manner, and relying on their payment, proceeded, with the knowledge of the defendant, to incur expense and assume liabilities.

"This presents the case of prejudice, expense and charge to the promisee, which is sufficient to constitute a valuable consideration for a promise—Chit.Contr. 30; 2

Kent's Com. 465–6; Johnson v. Wabash College, 2 Cart. (2 Ind.) 555. The consideration, therefore, must be deemed sufficient; and if the defendant has failed to reap the advantages which he expected to derive, he has the satisfaction of knowing that he assisted materially in producing the result."

In Hardin College v. Johnson, 221 Mo. App. 285, at page 289, 3 S.W.(2d) 264, 265, the St. Louis Court of Appeals, in deciding that certain subscription notes were valid and enforceable where the college donee had created obligations upon the faith of the subscriptions, said: "It is a general rule of law and one we think which has been closely adhered to in this state, that where subscriptions to charitable objects are made, and on the faith of these subscriptions, and before their withdrawal, the promisee performs some act—expends money, incurs enforceable liabilities, in furtherance of the enterprise—consideration for the subscription is supplied, and it is valid and binding."

To the same effect, see Pitt et al. v. Gentle, 49 Mo. 74; Workman v. Campbell, 46 Mo. 305; Corrigan v. Detsch, 61 Mo. 290; James v. Clough, 25 Mo.App. 147; Trustees of Christian University v. Hoffman, 95 Mo.App. 488, 69 S.W. 474.

■ There was an understanding between the college and James Clelland that the income from the latter's subscription was to be used in the establishment and maintenance of a "William Clelland Chair of English Bible." While that understanding was not incorporated in a formal declaration of trust until 1926, the Chair was established by the college shortly after James Clelland signed his subscription note, and was filled by Frank W. Clelland, son of William and nephew of James, for a number of years. The college incurred expense and assumed obligations in establishing and maintaining this Chair. It also assumed the responsibility of seeing that William Clelland's name was perpetuated through college bulletins and by such other means as are customary with colleges of the character of Missouri Wesleyan. That such undertakings constituted consideration sufficient to support the Clelland subscription is demonstrated by the cases already reviewed and also by the closely analogous case of Allegheny College v. National Chautauqua County Bank, 246 N.Y. 369, 159 N.E. 173, 174, 57 A.L.R. 980. In that case Allegheny College sought to recover from the National Chautauqua County Bank, as executor of the last will and testament of Mary Yates Johnston, $4,000 of a $5,000 subscription note which she had given the college. The note was payable thirty days after the death of the promisor, but $1,000 was paid prior to her death. It was stipulated by the promisor that "this gift shall be known as the Mary Yates Johnston memorial fund, the proceeds from which shall be used to educate students preparing for the ministry, either in the United States or in the Foreign Field." In the opinion written by Judge (now Mr. Justice) Cardozo, it is said (246 N.Y. 369, 159 N.E. 173, at page 176, 57 A.L.R. 980): "A parallel situation might arise upon the endowment of a chair or a fellowship in a university by the aid of annual payments with the condition that it should commemorate the name of the founder or that of a member of his family. The university would fail to live up to the fair meaning of its promise if it were to publish in its circulars of information and elsewhere the existence of a chair or a fellowship in the prescribed subject, and omit the benefactor's name. A duty to act in ways beneficial to the promisor and beyond the application of the fund to the mere uses of the trust would be cast upon the promisee by the acceptance of the money. We do not need to measure the extent either of benefit to the promisor or of detriment to the promisee implicit in this duty. 'If a person chooses to make an extravagant promise for an inadequate consideration, it is his own affair.' 8 Holdsworth, History of English Law, p. 17." And again on the same page: "We think the duty assumed by the plaintiff to perpetuate the name of the founder of the memorial is sufficient in itself to give validity to the subscription within the rules that define consideration for a promise of that order. When the promisee subjected itself to such a duty at the implied request of the promisor, the result was the creation of a bilateral agreement. Williston, Contracts, §§ 60a, 68, 90, 370; Brown v. Knapp, supra [79 N.Y. 136]; Grossman v. Schenker, supra [206 N.Y. 466, 100 N.E. 39]; Williams College v. Danforth, 12 Pick.(Mass.) 541, 544; Ladies' Collegiate Institute v. French, 16 Gray (Mass.) 196, 200. There was a promise on the one side and on the other a return promise, made, it is true, by implication, but expressing an obligation that had been exacted as a condition of the payment. A bilateral agreement may exist

though one of the mutual promises be a promise 'implied in fact,' an inference from conduct as opposed to an inference from words. Williston, Contracts, §§ 90, 22a; Pettibone v. Moore, 75 Hun, 461, 464, 27 N.Y.S. 455. We think the fair inference to be drawn from the acceptance of a payment on account of the subscription is a promise by the college to do what may be necessary on its part to make the scholarship effective."

In the case at bar it is not necessary to resort to inference to find a promise on the part of Missouri Wesleyan. That institution not only made the promise, but entered upon the fulfillment of it, in reliance upon James Clelland's subscription, by establishing and maintaining the "William Clelland Chair of English Bible." It is of no moment that only the income from his subscription was to be available for maintaining the Chair.

Another case supporting the holding that the establishment of the "William Clelland Chair of English Bible" was a sufficient consideration to constitute James Clelland's subscription a binding contract, is Trustees of Westminster College v. Estate of Gamble, 42 Mo. 411. The Missouri Supreme Court there held that a promise to pay $1,000 to the trustees of Westminster College when a fund of $20,000 was raised to endow a professorship, such $1,000 to be used only for that purpose, was binding where the amount was raised in the form of notes of solvent obligors and the professorship was established and maintained.

We next consider the validity of the $20,000 note and the trust deed executed by the appellees in favor of Missouri Wesleyan College. Since the subscription of James Clelland was a valid and binding obligation, we think it makes no difference whether the shifting of credit in the transactions of September, 1915, be regarded as a payment of James Clelland's subscription or as mere camouflage for the purpose of deceiving Mr. Rankin. If, in truth, the credit to the college's endowment fund account which the trust company entered on September 1, 1915, when James executed his note to it, constituted a payment of the subscription, as was evidently intended by the parties, then James' obligation on the subscription was extinguished and he was indebted only to the trust company. In order to satisfy that indebtedness, the appellees gave their $20,000 note and trust deed in consideration of a loan of credit from the college to apply upon James Clelland's indebtedness to the trust company. (We are assuming that Frank W. and William R. Clelland neither signed nor indorsed the $25,000 note of September 1, 1915, and that it was an obligation of James alone. It is, of course, obvious that the nephews would be liable on their own note if they were comakers or indorsers on the note of September 1, 1915.) James Clelland's obligation to the trust company was satisfied to the extent of the $20,000 credit subtracted from Missouri Wesleyan's endowment fund and applied thereon. It is apparent, then, that the appellees executed the $20,000 note to accommodate James—to enable him to be relieved of his obligation to the trust company. While it may be conceded that there was no consideration moving to the appellees, it is clear that James, the accommodated party, received a substantial consideration in the form of the satisfaction of a valid claim of the trust company against him. That in itself is sufficient to constitute the appellees' accommodation note a binding obligation. Greenway v. William D. Orthwein Grain Co. (C.C.A. 8) 85 F. 536, 537; Fenno v. Schulenberg (C.C.A.8) 32 F.(2d) 168, 169. Appellees concede the rule to be that an accommodation maker need not receive consideration if a valid consideration is received by the accommodated party, but they insist that no such valid consideration was received by James Clelland. The fallacy of this argument is clear if we assume that James Clelland, in good faith, created a binding obligation by giving his $25,000 note to the trust company on September 1, 1915, to secure the funds with which to pay his valid pledge to the college.

If it be assumed that the various transactions of September, 1915, resulting in the apparent payment of James Clelland's subscription, were mere camouflage for the purpose of deceiving Mr. Rankin and defrauding him of $25,000 (which is, to say the least, a violent assumption), and that the James Clelland subscription was not really paid by the transfer of credit to the college, then, by the principles of law set out above, we are forced to the same conclusion as to the validity of appellees' note and trust deed. If James Clelland's subscription was not paid by the transfer of credit to the college on September 1, 1915, then appellees' $20,000 secured note must have been delivered to the college, not for a loan to pay James' obligation to the trust company, since no such obligation was cre-

ated, but in partial payment of his original subscription. If that be the true situation, then the appellees still delivered their secured note as an accommodation to James Clelland, who, in turn, received a valuable consideration from the college by reason of the satisfaction pro tanto of his own subscription note, which was supported by a valid consideration.

It should also be noted that, if the transactions of September, 1915, in which the appellees participated, were not bona fide, but were done for the purpose of deceiving and defrauding Rankin, the appellees have no standing in a court of equity, since they come into court with unclean hands.

Appellees insist that their note never became a binding contract because it was not delivered. They argue that, because the note was executed at the request of James Clelland and pursuant to an agreement with him, they should not be required to pay, since there was never any delivery of the note with an intent to create a binding contract. The fallacy of this argument lies in the fact that any agreement that the note should not be paid by appellees was between them and James Clelland, and the college was no party to it and had no knowledge of it.

Other points raised in the briefs call for no discussion, in view of the decision reached.

The decree is reversed, and the case remanded, with directions to enter a decree in favor of the appellant, and for such further proceedings as may be necessary and not inconsistent with this opinion.